ANDREW B. PUNDY, Plaintiff-Appellant, v. THE DEPARTMENT OF PROFESSIONAL REGULATION *et al.*, Defendants-Appellees.

First District (5th Division) Nos. 1—89—1702, 1—89—3296 cons.

Opinion filed March 15, 1991.

476

Sandra G. Nye, Elizabeth B. Rosenbloom, and Allen E. Shoenberger, all of Sandra G. Nye & Associates, of Chicago, for appellant.

Roland Burris, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Ann Plunkett-Sheldon, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE McNULTY delivered the opinion of the court:

This opinion addresses two consolidated appeals of the plaintiff, Andrew B. Pundy, involving the suspension of his medical license. The first is an interlocutory appeal challenging the constitutionality of section 41 of the Medical Practice Act of 1987 (Medical Practice Act) (Ill. Rev. Stat. 1987, ch. 111, par. 4400—41), which prohibits the issuance of a stay of sanctions while judicial proceedings are pending. The second is an appeal of the circuit court's decision to uphold the decision of the Illinois Department of Professional Regulation finding Dr. Pundy guilty of professional misconduct and suspending his medical license for a period of six months to be followed by two years' probation.

On appeal, Dr. Pundy contends that (1) section 41 of the Illinois Medical Practice Act, prohibiting the issuance of a stay of sanctions pending review, is unconstitutional as applied to plaintiff and his patients; (2) the board's decision that the plaintiff had engaged in unprofessional conduct likely to cause harm to the public was against the manifest weight of the evidence; (3) the trial court applied the incorrect standard of review in its analysis of this case; (4) the plaintiff was deprived of procedural due process by the administrative proceeding; and (5) the penalty imposed upon the plaintiff by the board was arbitrary and capricious.

The relevant facts are as follows. On November 17, 1986, the Illinois Department of Professional Regulation (Department) filed a three-count complaint against Andrew B. Pundy, a psychiatrist. Count I of the complaint alleged that Dr. Pundy had engaged in sexual relations with Rebecca Besch, one of his patients, while she was under his care. Count II of the complaint alleged that Dr. Pundy had engaged in an improper dual relationship with Besch, acting as both her psychiatrist and her employer. Count III of the complaint alleged that Dr. Pundy had inappropriately utilized Besch as a therapist in his office when she did not have either the training or experience as such. The Department held a 16-day hearing on these charges.

It is undisputed that Dr. Pundy began treating Besch in March of 1982, for what Dr. Pundy diagnosed as acute anxiety disorder related to her employment situation. Furthermore, in July of 1982, Dr. Pundy hired Besch to work in his office. Moreover, at some point sexual relations ensued between Dr. Pundy and Besch.

There was, however, conflicting testimony as to when exactly the psychiatrist-patient relationship ended and when the sexual relations began. Besch testified that her first sexual contact with Dr. Pundy occurred at a regular therapy session sometime between June 12 and 15, 1982, and continued until November 1983. Besch testified that a few days after her first sexual encounter with Dr. Pundy, he offered her a job in his office as a biller. Besch testified that she was employed by Dr. Pundy from July 1, 1982, to November 27, 1983, and that sometime between July and September of 1982, her duties were expanded by Dr. Pundy to include acting as his co-therapist with several patients. She stated that throughout her employment with Dr. Pundy, she considered Dr. Pundy to be her doctor. On cross-examination, Besch testified that in June 1982 and thereafter, while she was employed by Dr. Pundy, she did not have formal 45-minute therapy sessions with him, but had a "continuous, free-floating appointment" for therapy, and that all her contacts with him were therapeutic.

Besch further testified that on November 27, 1983, Dr. Pundy terminated both their personal relationship and her employment. Besch testified that as a result of Dr. Pundy's conduct, she was unable to either hold a job or to engage in intimate relationships with men and even attempted to commit suicide.

Dr. Pundy, on the other hand, testified that it was with Besch's full agreement that he ended Besch's therapy sessions on June 5, 1982. Dr. Pundy further testified that on July 2, 1982, after he no longer considered Besch to be his patient, he offered her a position as a biller in his office. Beginning in the late fall of 1982, Dr. Pundy stated that he allowed Besch to act as a co-therapist, under his supervision, with selected patients. Pundy stated that his sexual relationship with Besch did not begin until the summer of 1983.

Dr. James Cavanaugh, a board-certified psychiatrist, testified as an expert witness on behalf of the Department. It was Dr. Cavanaugh's opinion that Dr. Pundy, by entering into a sexual relationship with Besch, failed to recognize and react to the issues of transference and countertransference, and therefore breached the standard of care applicable to psychiatrists. In transference, the patient transfers to the psychiatrist feelings she had about a past relationship, while in

countertransference, the therapist transfers to the patient feelings he had about a past relationship.

Four experts testified on Dr. Pundy's behalf, Dr. Patrick Staunton, Dr. Jerome Beigler, Dr. Anne Maxwell Seiden, and Gary Schoener. These experts disagreed either in whole or in part with Dr. Cavanaugh's theory on transference and countertransference. All four of these experts testified that Dr. Pundy had not violated any medical or ethical standard by entering into a sexual relationship with Besch.[1] Dr. Staunton and Dr. Schoener did state that each specific case must be decided according to whether the behavior would have a harmful effect on the former patient.

Following the administrative hearing, the hearing officer for the Department found that there was no credible evidence from which to establish improper sexual activity between Dr. Pundy and Besch during his medical treatment of her nor was there evidence from which to establish clearly and convincingly any violation of the Medical Practice Act. Consequently, the hearing examiner recommended that no discipline be imposed. Declining to follow the hearing officer's recommendation, the Medical Disciplinary Board (Board) found Dr. Pundy guilty of unprofessional conduct likely to harm the public, violating section 16(5) (Ill. Rev. Stat. 1983, ch. 111, par. 4433(5)),[2] and recommended to the Department that it suspend Dr. Pundy's medical license for six months to be followed by a probationary period of two years. The Board reached this conclusion based only on count I of the complaint and declined to reach any conclusion as to the issues raised in counts II and III of the complaint. The Department thereafter adopted the recommendation of the Board.

On June 2, 1989, plaintiff filed a complaint for judicial review of the decision of the Department finding him guilty of professional misconduct and suspending his licence. In conjunction with his complaint, plaintiff filed a petition for a stay of the Department's decision pending judicial review of the decision. The trial court denied plaintiff's

---

[1]Subsequent to this hearing, the Illinois legislature passed "An Act Concerning sexual exploitation by psychotherapists." Under this Act, a patient or former patient has a cause of action against a therapist for sexual contact while the patient was receiving therapy or within one year of terminating therapy. Ill. Rev. Stat. 1989, ch. 70, par. 801 et seq.

[2]In 1987, this subsection was repealed along with the rest of the Illinois Medical Practice Act but was reenacted as part of section 22 of the Illinois Medical Practice Act of 1987 (Ill. Rev. Stat. 1987, ch. 111, par. 4400—22).

petition, ruling that the court had no jurisdiction to grant a stay pending appeal since section 41 of the Illinois Medical Practice Act (Ill. Rev. Stat. 1987, ch. 111, par. 4400—41) prohibits such stays. On June 30, 1989, plaintiff filed an interlocutory appeal, challenging this ruling on the grounds that section 41 of the Medical Practice Act is unconstitutional as applied to Dr. Pundy and his patients. On November 3, 1989, the circuit court upheld the Department's decision as not being against the manifest weight of the evidence, and on November 29, 1989, plaintiff filed an appeal of this trial court decision.

We first address Dr. Pundy's contention that section 41 of the Medical Practice Act is unconstitutional as applied to plaintiff and his patients. Section 41 of the Illinois Medical Practice Act provides for judicial review of agency decisions pursuant to the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 *et seq.*) while also providing:

> "During the pendency and hearing of any and all judicial proceedings incident to such disciplinary action the sanctions imposed upon the accused by the Department shall remain in full force." (Ill. Rev. Stat. 1987, ch. 111, par. 4400—41.)

In *Ming Kow Hah v. Stackler* (1978), 66 Ill. App. 3d 947, 383 N.E.2d 1264, this court addressed the conflict between section 17.08[3] of the Medical Practice Act (Ill. Rev. Stat. 1975, ch. 91, par. 16b.08), which prohibited the issuance of a stay pending review, and section 3—111(a)(1) of the Administrative Review Act, which authorized the circuit court to issue a stay. The court held that as a matter of statutory construction, section 17.08 prevailed over the earlier enacted, more general provision of the Administrative Review Act.

Although *Ming Kow Hah* did not address the constitutionality of prohibiting a stay pending review, this issue was later addressed in *Blumstein v. Clayton* (1985), 139 Ill. App. 3d 611, 487 N.E.2d 1176. In *Blumstein*, following an administrative hearing, the Department of Professional Registration and Education (now the Department of Professional Regulation) suspended the plaintiff's license to practice medicine for 90 days and placed the plaintiff on probation for two years. The plaintiff filed a complaint for administrative review and sought to enjoin the Department from enforcing sanctions pending review. The trial court denied the stay, ruling that section 17.08 prohibited any injunction and was constitutional. *Blumstein*, 139 Ill. App. 3d at 612.

---

[3]Section 17.08 of the Medical Practice Act was repealed but was reenacted with the identical language as section 41 of the Medical Practice Act of 1987.

On appeal, the plaintiff contended that section 17.08 violated his right to equal protection by treating physicians differently from other health care professionals. (*Blumstein*, 139 Ill. App. 3d at 613.) The court rejected the plaintiff's argument, holding that sanctioned doctors present a greater risk of harm to the public than other health care professionals and this greater risk justifies the difference in treatment. The court noted that this is essentially a risk-shifting device. "Recognizing the possibility of erroneous decisions by administrative agencies, the legislature provided for judicial review, but allocated the risk of error to the doctor as opposed to the public." *Blumstein*, 139 Ill. App. 3d at 614.

In the case at bar, plaintiff contends that *Blumstein* is not applicable to cases involving psychiatrists. Plaintiff maintains that the court must balance the possible erroneous damage to Dr. Pundy's interest with the governmental interest in protecting the public. Plaintiff contends that while there is indeed a governmental interest in preventing injury to patients by dangerous practitioners, there is no such governmental interest in the immediate cessation of Dr. Pundy's practice without allowing him the opportunity to arrange for the orderly transition of fragile or potentially dangerous patients to other psychiatrists. Plaintiff claims that physicians are generally "fungible," and one doctor is as good as another to tend to the physical ills of a patient. He maintains that psychiatrists, however, are not fungible in light of the fact that the personal relationship between a psychiatrist and his patient is the very essence of the treatment.

■ Plaintiff's contention that psychiatrists are of more value to their patients and the public than other doctors is unpersuasive. Different physicians have different degrees of skill, and a patient may be dependent on a particular physician because of his particular degree of skill. Moreover, while the personal knowledge between a psychiatrist and his patient is generally more intimate than the personal knowledge between other physicians and their patients, counseling is still a part of most doctor-patient relationships.

■ Plaintiff also maintains that the prohibition of such stays violates his constitutional right to due process. This contention is also without merit. The *Blumstein* court rejected the argument that section 17.08 violates the plaintiff's right to due process, pointing out that the sanctions against the plaintiff were imposed only after a full hearing before the Medical Disciplinary Board. *Blumstein*, 139 Ill. App. 3d at 616.

Thus plaintiff's due process argument in the present case must also fail. His sanctions were imposed only after a 16-day hearing be-

fore the Medical Disciplinary Board. In light of the decision in *Blumstein,* the circuit court's order denying the plaintiff a stay pending judicial review is affirmed.

■■■ Plaintiff next contends that the Board's decision that plaintiff engaged in unprofessional conduct likely to harm the public is against the manifest weight of the evidence. We disagree. The findings of an administrative agency on questions of fact are held to be *prima facie* true and correct and are not to be disturbed unless contrary to the manifest weight of the evidence. (*Garland v. Department of Labor* (1984), 104 Ill. 2d 383, 472 N.E.2d 434.) For a judgment to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident. (*Cicmanec v. Department of Registration & Education* (1989), 182 Ill. App. 3d 710, 538 N.E.2d 1166.) A reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact. (*Zaderaka v. Human Rights Comm'n* (1989), 131 Ill. 2d 172, 545 N.E.2d 684.) If the issues are merely ones of conflicting testimony or credibility of witnesses, the determinations of the agency should be upheld. *Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 391 N.E.2d 190.

■■ Plaintiff contends that the Department's findings are contrary to the manifest weight of the evidence and legally erroneous. Initially, plaintiff maintains that the Board reached its decision by relying on the faulty conclusions of Dr. Cavanaugh and relying on matters outside of the record while ignoring the testimony of Dr. Pundy's experts. In support of his argument that the Board's factual findings were against the manifest weight of the evidence, plaintiff notes that the Board stated in its findings of fact and conclusions of law and recommendations that its decision was arrived at "less on a determination of factual issues than on fundamental principles to be observed by all doctors." As plaintiff explains, members of an administrative tribunal may not rely on their own expertise in making factual determinations. (*Ladenheim v. Union County Hospital District* (1979), 76 Ill. App. 3d 90, 394 N.E.2d 770.) Rather, the decision must be based on evidence presented at the hearing.

The record reveals the following factual evidence in support of the Board's finding that Dr. Pundy's conduct was substandard. While Dr. Cavanaugh was the only expert who concluded that Dr. Pundy deviated from the standard of care expected of a qualified psychiatrist by becoming sexually involved with a former patient, testimony of Dr. Pundy's experts could also support the Board's conclusion that Dr. Pundy engaged in unprofessional conduct likely to harm the public. Dr. Staunton testified that while the physician's code of ethics did not

address the issue of sexual relations with a former patient, each case must be decided according to whether this behavior could have a deleterious effect on the former patient. Similarly, Dr. Schoener testified that such cases should be resolved on the basis of whether there was an exploitation of the therapeutic relationship. Dr. Schoener also testified that if the former patient still maintains a tie to the therapist or still relates to the doctor as a therapist, it is not clear that therapy has ended. Moreover, he stated that it was entirely the physician's responsibility to prevent sexual relations from occurring between the psychiatrist and his patient.

The Board, after evaluating the testimony of the parties and the various expert witnesses, stated that a pattern of behavior had emerged upon which it could base its decision. The Board first noted that Besch had a long-standing psychiatric history and an inability to handle her work situation at the time she first consulted with Dr. Pundy. Moreover, the Board pointed out that Besch's inability to secure alternative employment up to the time that Dr. Pundy hired her and her financial demands indicated to the Board and should have indicated to Dr. Pundy that she continued to have problems after June of 1982 which were related to issues which brought her under his care initially.

The Board stated that rather than reinstitute therapy or secure other treatment for Besch, Dr. Pundy ignored the warning signs and entered into a sexual relationship with Besch at a time when he was feeling distant from his own marriage. The Board noted that Dr. Pundy acted in his own interest and not in the interest of Besch. The Board concluded by stating:

"What is right is that a patient should not be harmed by a doctor. That principle applies whether formal termination has occurred or not. An obligation attaches once he or she comes under the care of a physician that does not disappear until there has been a proper ending to that relationship.

As has been noted above, a special measure of dependence arises, indeed may even be encouraged in many cases, from the psychiatrist/patient relationship—no matter how brief or supportive—that finds its genesis in the emotional vulnerability of the patient. At best, Dr. Pundy was not fully conscious of this patient's vulnerability, and this insensitivity to her condition ultimately led in ways clearly detrimental to her welfare."

Thus, based on the testimony contained in the record, there is sufficient evidence to support the Board's conclusion that Dr. Pundy engaged in unprofessional conduct likely to harm the public. The ex-

perts agree that a psychiatrist should not harm his patient. Yet that is exactly what Dr. Pundy did by entering into a sexual relationship with Besch. Besch testified that she was distraught by the termination of her relationship with Dr. Pundy and she therefore attempted to commit suicide. Moreover, although Dr. Pundy knew that Besch was emotionally unstable, he failed to secure other treatment for her.

Furthermore, in reaching its conclusion that Dr. Pundy's conduct harmed Besch, the Board noted that a special measure of dependence arises from the psychiatrist-patient relationship. Even Dr. Pundy has recognized this special relationship. In support of Dr. Pundy's earlier argument that section 41 of the Medical Practice Act is unconstitutional as applied to psychiatrists and their patients, plaintiff contended that psychiatrists are not fungible in light of the fact that the personal relationship of a psychiatrist to his patient is the very essence of the treatment. Plaintiff further maintained that "[s]hould a patient harm herself grievously, or erupt in a shooting spree in a local school, no amount of 'special damages' to Dr. Pundy would remedy that." It is for this very reason that Dr. Pundy should have avoided entering into a sexual relationship with Besch. Consequently, plaintiff's contention that the Board reached its conclusion by relying on evidence outside of the record is without merit as is his argument regarding the weight given to the testimony of the various experts.

In addition, plaintiff contends that the Department's conclusions of law are erroneous. The Department found Dr. Pundy guilty of violating section 16(5) of the Medical Practice Act, "[e]ngaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public." (Ill. Rev. Stat. 1983, ch. 111, par. 4433(5).) Plaintiff claims that this section is overbroad and fails to encompass a sexual relationship with a former patient.

●7 We reject plaintiff's argument that the statute is overly broad. In *Chastek v. Anderson* (1981), 83 Ill. 2d 502, 416 N.E.2d 247, the supreme court, in reviewing a section of the Illinois Dental Practice Act, stated:

"[T]erms such as 'unprofessional conduct' are susceptible to common understanding by the members of the profession. When combined with the legislative purpose of protecting the public from people unfit to practice, the term 'unprofessional conduct' provides fair notice to licensed professionals and is not constitutionally vague." (*Chastek*, 83 Ill. 2d at 509.)

The court pointed out that a statute such as this must be broad because it would be impossible for a statute to catalog specifically every

act of unprofessional or dishonorable conduct which would justify the revocation of a license. *Chastek*, 83 Ill. 2d at 510.

■■ Moreover, it should be noted that when a broad statutory standard has been delegated to an agency's discretion, the reviewing court should rely on the agency's interpretation as controlling. *Cicmanec v. Department of Registration & Education* (1989), 182 Ill. App. 3d 710, 717, 538 N.E.2d 1166.

Plaintiff cites to *Yero v. Department of Professional Regulation* (Fla. App. 1985), 481 So.2d 61, in support of his argument that a sexual relationship with a former patient is not a violation of accepted standards of medical practice. *Yero*, however, is distinguishable from the instant case in light of the fact that in *Yero*, the sexual relationship occurred after the patient's therapy sessions had been clearly terminated, the psychiatrist had refused to see her again as a patient and had advised her to find another psychiatrist.

In the instant case, Besch testified that she still considered Dr. Pundy to be her physician even after he told her that he was terminating her therapy sessions. She worked in Dr. Pundy's office and continued to discuss her problems with Dr. Pundy. Thus, there was no clear-cut ending to the therapy with Dr. Pundy advising Besch to seek help from another psychiatrist. Therefore, the Department's finding that Dr. Pundy was guilty of engaging in unprofessional conduct likely to harm the public is neither factually against the manifest weight of the evidence nor legally erroneous.

Plaintiff next contends that the trial court erred in its review of this case because it did not consider the written report of the hearing officer which found in favor of Dr. Pundy. Plaintiff's argument is, however, contrary to applicable case law. Plaintiff concedes that there is no requirement that the Board rehear the evidence in order to reject its hearing officer's finding and recommendations. (*Starkey v. Civil Service Comm'n* (1983), 97 Ill. 2d 91, 100, 454 N.E.2d 265.) Plaintiff nonetheless contends that *Starkey* does not speak to the weight which should be given by a reviewing court to the hearing officer's report. Plaintiff points to the United States Supreme Court decision in *Universal Camera v. National Labor Standards Board* (1951), 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456, and other Federal cases applying the Administrative Procedure Act which have ruled that significance must be given to the findings of the hearing officer.

■■ This court has repeatedly found that while the decision of the hearing officer is part of the record, it is the decision of the Board, not the hearing officer, which is reviewed by the court. (*Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d

1138; *Carroll v. Board of Review* (1985), 132 Ill. App. 3d 686, 691, 477 N.E.2d 800; *Gregory v. Bernardi* (1984), 125 Ill. App. 3d 376, 465 N.E.2d 1052.) Accordingly, the trial court applied the correct standard of review by ascertaining whether the Board's findings were contrary to the manifest weight of the evidence.

 Plaintiff next contends that the proceedings as conducted by the Department deprived Dr. Pundy of due process of the law. Specifically, plaintiff maintains that he was deprived of a fair hearing by virtue of the fact that not all members of the Board were in attendance at the hearing when evidence was heard. Due process does not require that a quorum of the decision-making board personally hear all of the evidence in order for an administrative determination to be valid. (*McCabe v. Department of Registration & Education* (1981), 90 Ill. App. 3d 1123, 413 N.E.2d 1353, *cert. denied* (1981), 454 U.S. 838, 70 L. Ed. 2d 119, 102 S. Ct. 143; *Homefinders, Inc. v. City of Evanston* (1976), 65 Ill. 2d 115, 357 N.E.2d 785.) All that is required is that the administrative agency consider the evidence contained in the transcript of the proceeding and base its decision thereon. *Bruns v. Department of Registration & Education* (1978), 59 Ill. App. 3d 872, 376 N.E.2d 82.

 In the instant case, there is no evidence that the Board members failed to review the entire transcript of the proceedings before the Board rendered its decision. Plaintiff's argument is therefore unpersuasive.

Plaintiff further maintains that he did not receive a fair and impartial hearing because the administrative hearing in this case was nothing more than a partisan hearing with the Department arrayed against Dr. Pundy. Specifically, plaintiff alleges that the Department failed to thoroughly investigate its case and it harassed and intimidated witnesses. Plaintiff also contends that a blatant effort was made by the prosecution to garner sympathy for Besch by repeatedly making reference to the prejudicial fact that Besch's daughter was dying and then that her daughter had died.

Plaintiff relies on *Gigger v. Board of Fire & Police Commissioners* (1960), 23 Ill. App. 2d 433, 163 N.E.2d 2d 541, in support of his contention that he was deprived of procedural due process. In *Gigger*, the court found that plaintiff had been deprived of a fair hearing primarily because the administrative agency attempted to prove his guilt rather than ascertain the true facts. In *Gigger*, the Board's attorney had also acted as the hearing officer, conducting the hearing and ruling on the evidence. *Gigger*, 23 Ill. App. 2d at 437.

 █ It is well established that a hearing before an administrative agency should not be a partisan hearing with the agency on one side arrayed against the individual on the other. (*Lakeland Construction Co. v. Department of Revenue* (1978), 62 Ill. App. 3d 1036, 379 N.E.2d 859.) Rather, it should be an investigation instituted for the purpose of ascertaining and making findings of fact. (*Lavin v. Civil Service Comm'n* (1974), 18 Ill. App. 3d 982, 310 N.E.2d 858.) A fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses and impartiality in ruling upon the evidence. *Mahonie v. Edgar* (1985), 131 Ill. App. 3d 175, 476 N.E.2d 474.

 In the instant case, there is no indication that plaintiff was the victim of unfair rulings concerning the admissibility of evidence, or that he was denied the right to cross-examine adverse witnesses. The Department's hearing officer conducted the hearing, and plaintiff has conceded that the hearing officer's conduct was fair and impartial.

 Finally, plaintiff maintains that the six-month suspension imposed upon him by the Department was arbitrary and overly harsh in view of the fact that he had "no history of wrongdoing" and he had "taken steps to remedy whatever caused or enabled him to be exploited by Rebecca Besch." A reviewing court will not substitute its judgment for that of an agency, absent an abuse of discretion. (*Citrano v. Department of Registration & Education* (1980), 90 Ill. App. 3d 937, 939, 414 N.E.2d 74.) An agency abuses its discretion when it imposes a sanction overly harsh in view of the mitigating circumstances or which is unrelated to the purpose of the statute. *Ballin Drugs, Inc. v. Department of Registration & Education* (1988), 166 Ill. App. 3d 520, 531, 519 N.E.2d 1151.

 In the instant case, the sanction imposed upon Dr. Pundy was neither overly harsh nor unrelated to the purpose of the Illinois Medical Practice Act. The sanction was clearly not overly harsh even in light of the mitigating circumstances. We note that the Department did not revoke Dr. Pundy's license. It merely suspended his license for a period of six months and placed him on probation for a period of two years. Furthermore, the Department suspended Dr. Pundy's license because it determined that he had engaged in conduct likely to harm the public. During Dr. Pundy's suspension and probation, he was to receive therapy in order to prevent such conduct from recurring. Thus the suspension of Dr. Pundy's license is directly related to the purpose of the statute. Consequently, the Department did not abuse its discretion in suspending for six months Dr. Pundy's license.

Accordingly, the circuit court's order denying plaintiff a stay pending judicial review is affirmed as is the decision of the circuit court upholding the Department's decision to suspend plaintiff's license.

Judgment affirmed.

MURRAY and GORDON, JJ., concur.